**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

TIM MOLYNEUX PRODUCTIONS et al., )
)
        Plaintiffs, )   Case No.: 2:09-cv-00645-GMN-LRL
  vs. )
) **ORDER**
PLATINUM MASTERS MONSTER CIRCUS )
et al., )
)
        Defendants. )

    Currently pending before the Court is Plaintiffs' Motion for Summary Judgment against Defendants Paul Zamek and Pete Merluzzi (ECF No. 60). On June 11, 2010, this Court granted in part and denied in part a substantively identical motion against all of the other remaining defendants in this case. (*See* ECF No. 55). However, whereas the defendants did not respond to Plaintiffs' earlier motion for summary judgment, Defendants Zamek and Merluzzi did respond to the motion now pending before the Court. Based on their Response (ECF No. 63), as well as Plaintiffs' Motion (ECF No. 60) and Reply (ECF No. 64), this Court denies Plaintiffs' Motion (ECF No. 60), vacates its earlier Order (ECF No. 55), and denies Plaintiff's earlier Motion for Summary Judgment (ECF No. 51).

**I.    FACTS AND PROCEDURAL HISTORY**

    According to the First Amended Complaint ("FAC"), Plaintiff Tim Molyneux, owner of Plaintiff Tim Molyneux Productions ("TMP"), is a long-time creator, producer, and manager of live theater shows in Las Vegas, Nevada. In October 2008, Defendant Anthony Cardenas, a.k.a. Tony Montana ("Cardenas"), approached Molyneux about assisting Cardenas with developing one of his concepts into a live show for commercial exploitation. That concept involved integrating live performances by rock bands with "killer clowns." Molyneux organized, produced, directed, co-wrote, cast, and presented a forty-five-minute showcase ("the Showcase")

of the concept, which premiered at the Las Vegas Hilton on December 9, 2008.

Based on the success of the Showcase, Defendants Cardenas, Paul Zamek, Pete Merluzzi, and Kevin Wayne Waldrup ("the Individual Defendants") asked Molyneux to develop the showcase into a seventy-five-minute version of the show ("the Monster Circus Show") to play at the Hilton.[1]  Molyneux and TMP began work on December 10, 2008, and began negotiations with the Individual Defendants regarding production.  Molyneux executed a written agreement with the Hilton on January 9, 2009.[2]  On or about January 31, 2009, unspecified "Parties" agreed in an unspecified manner that TMP was to be paid $190,800 for pre-production services, $3000 per week for fifty-two (52) weeks, 5% of gross box office sales, 2.5% of "other exploitations & extra bookings," and 20% of sponsorships and endorsements.  The Monster Circus Show in its final form consisted of "a high octaine [sic] live rock concert with sexy dancers, human circus acts, aerialists, freaks, Sicko the Clown as the irreverent ringmaster mascot, and a tour bus full of platinum certified rock stars, who will perform rock n' roll anthems spanning three decades."  (Compl. ¶ 31, ECF No. 1-2).  Defendants Hilton and Platinum Masters Monster Circus, LLC ("Platinum Masters") issued press releases stating that Molyneux was the director, producer, and co-writer of the show, which was set to open at the Hilton on March 19, 2009.  Plaintiffs allege that on or about March 10, 2009, Molyneux discovered that the Individual Defendants had contacted Molyneux's venders, choreographers, etc. "behind his back" in order to usurp his contacts and "cut[] Molyneux out of the production."  That day, Platinum Masters informed TMP that its services were no longer needed.  Plaintiffs claim they worked in good faith and have never received any compensation.

Defendants tell a slightly different story.  Defendants agree that after Defendants had

---

[1] Plaintiff claims the Individual Defendants acted "by and through" Defendant Platinum Masters Monster Circus, LLC, but admits that Platinum Masters Monster Circus, LLC had not yet been incorporated.

[2] Colony Resorts LVH Acquisitions, LLC, dba Las Vegas Hilton ("Hilton") has been dismissed with prejudice by stipulation. (*See* Order, Nov. 18, 2009, ECF No. 42 (Jones, J.)).

already developed the Monster Circus Show concept, the Individual Defendants contacted Molyneux to help produce the Showcase as a marketing tool for the Monster Circus Show and to find a suitable venue to present the Showcase. However, Molyneux was unable to secure a venue, and non-party J. Eric D'Richards arranged for the Showcase to be performed at the Hilton on December 9, 2008. Then, on December 10, the day after the successful Showcase, the Individual Defendants approached D'Richards to negotiate for a long-term run of the Monster Circus Show at the Hilton. But on or about December 11, Plaintiff TMP itself hired D'Richards and began negotiations with Hilton, misrepresenting to Hilton that Plaintiffs created, and owned intellectual property rights in, the Monster Circus Show. At the same time, Plaintiffs and the Individual Defendants were negotiating between themselves as to continued production of the show. These negotiations, of which Hilton was not a part, are the basis of Plaintiffs' present contract and quasi-contract claims. On or about January 9, 2009, Molyneux and Hilton entered into a written contract setting forth the terms under which Hilton was willing to host the Monster Circus Show, but this contract had nothing to do with the production of the show, the terms of which Molyneux was still negotiating with the Individual Defendants. According to Defendants, Molyneux and the Individual Defendants never came to an agreement on production of the show, and the Individual Defendants eventually produced the show without Plaintiffs. The failure to agree was apparently based largely on Molyneux's having grossly overcharged Defendants for the service of third-party venders during production of the Showcase, with Molyneux pocketing the difference between invoices from Plaintiffs to Defendants and invoices from third-party venders to Plaintiffs. Also, after Plaintiffs proposed a $1 million budget to Defendants for the first run of the show, Defendants contacted the choreographer and dancers to determine what they were charging Plaintiffs, only to learn that Plaintiffs had not fully paid them from the Showcase. Defendants contacted Hilton and informed it that they would no longer be using Plaintiffs' services. Hilton at first refused to permit the show to run at its venue without

Plaintiffs' involvement, based on Plaintiffs' misrepresentations that Plaintiffs owned intellectual property rights to the show.  After Defendants' counsel explained to Hilton that this was not true, Hilton agreed to host the show without Plaintiffs' participation.  The Monster Circus Show then opened at the Hilton in March 2009.

On March 20, 2009, Plaintiffs Molyneux and TMP sued six defendants in state court: (1) the four Individual Defendants; (2) Platinum Masters; and (3) Hilton.  Plaintiffs soon thereafter filed the FAC to retract their cause of action for copyright infringement.  The FAC lists nine causes of action: (1) Declaratory and Injunctive Relief; (2) Breach of Contract; (3) Unjust Enrichment; (4) Fraud in the Inducement; (5) Promissory Estoppel; (6) Breach of Covenant of Good Faith and Fair Dealing; (7) Alter Ego; (8) Defamation; and (9) Accounting.  With the exception of the defamation claim, all of these causes of action sound in contract (or quasi-contract), except for the first and ninth causes of action (which are remedies, not causes of action) and the seventh cause of action (which is a legal doctrine, not a cause of action).

The Court has granted the parties' stipulation to dismiss the claims against Hilton with prejudice.  On April 30, 2009, Plaintiffs filed a motion asking the Court to order Defendants to show cause why a prejudgment writ of attachment should not issue.  The motion was postponed due to a stipulation of the parties to conduct a settlement conference.  When no settlement was reached, Plaintiffs pressed the original motion.  At the April 5, 2010 hearing, however, Plaintiffs withdrew the motion in order to file a Motion for Summary Judgment (ECF No. 51) on their breach of contract claim.  Defendants failed to respond to that Motion, and the Court granted it in part as against all remaining Defendants except Zamek and Merluzzi, who not been served with the Motion.  Plaintiffs have now filed a substantively identical Motion for Summary Judgment (ECF No. 60) against Zamek and Merluzzi and appear to have properly served them, as those defendants filed a Response to the Motion (ECF No. 63).

/ / /

## II. SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In deciding a motion for summary judgment, a court applies a burden-shifting analysis:

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S.

1  144, 159–60 (1970).

2  If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). However, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III.   ANALYSIS

In order to prevail on a breach of contract claim in Nevada, a plaintiff must show: (1) the existence of a valid contract; (2) a breach by the defendant; and (3) damages as a result of the breach. *Cohen-Breen v. Gray Television Group, Inc.*, 661 F. Supp. 2d 1158, 1171 (D. Nev. 2009). Summary judgment cannot be granted here because there is a question of fact as to whether a valid production services contract existed between Plaintiffs and Defendants.

Plaintiffs attach twenty-two exhibits to their motion, including an affidavit from Plaintiff Tim Molyneux. (*See* Molyneux Aff., ECF No. 60 Ex. 1). Molyneux alleges the breach of a

services contract with a fifty-two week duration and definite terms.  Molyneux believes he is entitled to recover $190,800 for agreed-upon pre-production costs, and $3000 per week for fifty-two weeks as salary, for a total of $346,800.  Molyneux also claims various royalties and commissions, but he does not specify a particular sum.

Apart from Molyneux's own interested affidavit, Plaintiffs provide additional evidence to support the existence of an agreement by Defendants to pay Plaintiffs $3000 per week for fifty-two weeks as salary, as well as royalties.  Exhibit 15 is an email from "waldropk1@aol.com," initialed "KW"--ostensibly Defendant Kevin Waldrop—and offering: (1) pre-production fees of $15,000 to "Tim"; (2) pre-production fees of $10,000 to "Eric"; (3) fifty-two weeks of salary to "Tim" at $1,500 per week and 5% of gross box office receipts minus "investor take estimated at $5,000 to $6,000 per week," or, in the alternative, $2,000 per week and 5% of gross box office receipts after "complete investor payback"; and (4) $1,500 per week to "Eric." (Mot. Summ. J. Ex. 15).  There is also discussion of percentages of royalties and merchandise sales. (*See id.*). This alone is only evidence of negotiations and an offer; however, Plaintiffs also attach the affidavit of J. Eric D'Richards, who claims to have been present at a February 4, 2009 meeting at Molyneux's home between Molyneux, Cardenas, Merluzzi, Waldrop, and D'Richards, but apparently not Zamek. (*Id.* Ex. 17, at ¶¶ 3–4).  D'Richards attests that, at the meeting, the parties agreed on compensation for Molyneux's services as producer, director, co-writer, and agent of the Monster Circus Show, in the amount of: (1) $3000 per week for fifty-two weeks, with $1500 per week each to Molyneux and D'Richards; (2) 5% commission for gross box office sales/royalties for "agenting" the deal; (3) 2.5% commission from "all other exploitations & extra bookings"; and (4) 20% commission for all sponsorships/endorsements garnered by Molyneux. (*Id.* Ex. 17, at ¶ 5).

Although D'Richards' affidavit lends some support to Plaintiffs' contention that a valid, well-defined contract existed, Defendants demonstrate in their Response and the exhibits

attached to it that questions of material fact still exist as to whether that alleged contract was actually formed.  Exhibit 6 to Defendants' Response is an e-mail from Defendant Zamek to Plaintiff Molyneux, dated February 16, 2009, which was ten days after Plaintiffs allegedly entered into a contract with Defendants.  In that e-mail, Zamek writes, "[p]lease advise if you are willing to go forward with us in this crucial planning period and if we can still continue to work through our technical, marketing, production etc aspects while we also continue to negotiate and formalize," (Resp., Ex. 6, ECF No. 63), thereby seeming to imply that an agreement had not yet been finalized with Molyneux.

Then, on February 27, 2009, Defendant Cardenas appears to have sent Plaintiff Molyneux an e-mail stating, "I'm so glad to see that there is some healthy, level headed communications [sic] going on between our camps today.  We need to cooperate to finalize this today." (Resp., Ex. 7, ECF No. 63).  In response to Cardenas's e-mail, Molyneux replied, on the same day, "My goal would be to have both Platinum/Molyneux and LVH contracts knocked out today." (*Id.*).  Such a reply could easily be read by a reasonable juror as implicitly indicating that a contract had not yet been reached between Plaintiffs and Defendants because one does not normally agree to finalize or "knock[] out" an agreement unless it has not yet been created.  Hence, there is still a genuine issue of fact as to whether a contract existed to be breached.

Defendants Merluzzi, Zamek, Cardenas, and Waldrop have also all submitted affidavits in which they attest that no production contract--oral or written--was entered into between them and Plaintiffs. (*See* Resp., Exs. 1–4, ECF No. 63).  Further, they attest that, although they--with the exception of Zamek--were at Plaintiff Molyneux's house on February 4, 2009, the purpose of that visit was to audition Mario Ferrera as the Master of Ceremonies for the Monster Circus Show, and they did not reach any agreement with Plaintiffs about Plaintiffs' participation in the Monster Circus Show while there. (*See, e.g.,* Resp. Ex. 4 ¶¶ 8–12, ECF No. 63).  Such affidavits, which are based on personal knowledge and articulate facts offering an alternate explanation of

why the Defendants were at Molyneux's house on February 4th, establish a triable issue as to whether an agreement between Plaintiffs ever existed, particularly when viewed in conjunction with the February 27th e-mail exchange. Therefore, summary judgment is inappropriate, and the Court denies Plaintiffs' Motion for Summary Judgment as to Defendants (ECF No. 60).

This ruling, however, appears to bring about an absurd result: it seems incongruous for the Court to rule here that the there is a triable issue of fact as to whether the alleged contract actually existed when the Court has already awarded damages under the same alleged contract. (*See* Order, ECF No. 55). In addressing the incongruity, it is first necessary to address Plaintiffs' misconception of this Court's earlier Order.

In their Reply, Plaintiffs assert that "this Court has already ruled that there was a contract, and that Defendants are liable for breach of contract." (Reply 4:16–17, ECF No. 64). That is not an entirely accurate representation of the Court's Order. Rather than positively ruling that there was a contract, the Court merely ruled that Plaintiffs had fulfilled their initial burden of showing that there were no unresolved issues of fact as to the existence of the contract or its breach, and that Defendants had failed to respond and rebut Plaintiffs' showing, thus entitling Plaintiffs to contract damages as a matter of law. Here, on the contrary, Defendants Zamek and Merluzzi did respond and were able to cast doubt on Plaintiffs' initial showing that there are no unresolved issues of material fact as to whether a contract actually existed. But, what is to be done with such conflicting outcomes? Is the Court to simply leave its earlier ruling unaltered, even though two of the Defendants have called into question the existence of the same contract at issue in the earlier Motion for Summary Judgment? In brief, the answer is "no."

In *Frow v. De La Vega*, 82 U.S. 552, 553 (1872), the Supreme Court was confronted with a situation in which the complainant had charged eight defendants with joint conspiracy to defraud him out of a large tract of land, but only seven defendants responded, leading to the entry of a default and a formal decree *pro confesso* against the eighth defendant. After the

decree was entered against the eighth defendant, the lower court then proceeded to try the case against the other defendants on the merits, ultimately finding against the complainant. *Id.* The eighth defendant then appealed, arguing that the decree should be vacated against him, as the court had determined, on the merits, that the conspiracy of which he was alleged to have been a part had not actually existed in the eyes of the law. *Id.*

The Court sided with the eighth defendant and reversed the district court, reasoning:

> [i]f the court in such a case as this can lawfully make a final decree against one defendant separately, on the merits, while the cause was proceeding undetermined against the others, then this absurdity might follow: there might be one decree of the court sustaining the charge of joint fraud committed by the defendants; and another decree disaffirming the said charge, and declaring it to be entirely unfounded, and dismissing the complainant's bill. . . . Such a state of things is unseemly and absurd, as well as unauthorized by law. . . . [I]f the suit should be decided against the complainant on the merits, the bill will be dismissed as to all the defendants alike-the defaulter as well as the others.

*Id.* at 554. In other words, when the defendants would be held jointly liable and/or are similarly situated and one or more of the defendants defaults, the case should be dismissed against both the answering and defaulting defendants if the case is decided in the answering defendants' favor. *See In re First T.D. & Inv., Inc.*, 253 F.3d 520, 532 (9th Cir. 2001). The *Frow* rule has also been applied to grant to a defaulting party the benefits of a successful motion to dismiss, *see Barnes v. Boyd*, 8 F. Supp. 584, 600 (S.D. W.Va. 1934), and a successful motion for a directed verdict, *see Davis v. National Mortgagee Corp.*, 349 F.2d 175, 178 (2d Cir. 1965). It has also been applied to grant summary judgment to a defendant who--although not in default--failed to file an affidavit with his motion for summary judgment after the Court had instructed him to do so, when the other similarly-situated defendants had filed affidavits and demonstrated that they were entitled to summary judgment. *See Anthony v. Burkhart*, 28 F. Supp. 2d 1239, 1247 (M.D. Fla. 1998).

The *Frow* rule also applies here. Although the Defendants served with Plaintiffs' initial Motion for Summary Judgment (ECF No. 51) did answer the initial Complaint, and, therefore,

1  are not in technically in default in this lawsuit, their failure to respond to the Motion resulted in
2  the Motion essentially being granted by default, as it prevented them from rebutting Plaintiffs'
3  initial showing of a lack of triable issues of fact.  However, when the other similarly-situated
4  Defendants--Zamek and Merluzzi--did respond, they were able to show that the alleged contract
5  upon which both Motions were based--and under which all Defendants are alleged to be liable--
6  did not necessarily exist, thereby making summary judgment inappropriate with regard to a
7  breach of contract claim based on that alleged contract.  To find that a contract was not
8  necessarily created while at same time forcing similarly-situated defendants to pay damages
9  based on that same contract would result in the sort of "absurd" and "unreasonable" result that
10  *Frow* cautioned against.

Accordingly, the Court's June 11, 2010 Order (ECF No. 55) shall be vacated, and Plaintiff's earlier Motion for Summary Judgment (ECF No. 51) shall be denied, as Defendants have demonstrated that there is a question of fact as to whether a contract was created between Plaintiffs and them.  It is well within the Court's power under Federal Rule of Civil Procedure 54(b) to so modify its earlier Order at this time[3].

## **CONCLUSION**

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment (ECF No. 60) is DENIED.

IT IS FURTHER ORDERED that the Court's June 11, 2010 Order (ECF No. 55) is

/ / /

/ / /

/ / /

/ / /

---

[3] Grants of partial summary judgment are merely interlocutory orders subject to revision. *See In re Pintlar Corp.*, 124 F.3d 1310, 1312 (9th Cir. 1997); Rule 54(b).  Such orders can be modified *sua sponte* or in response to a motion. *I.H. ex rel. Litz v. County of Lehigh*, 2007 WL 2781264, *1 (E.D. Pa. Sept. 24, 2007).

1 VACATED.

2 IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment (ECF No.
3 51) is DENIED.

4 DATED this 5th day of October, 2010.

_____
Gloria M. Navarro
United States District Judge